IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

REYNALDO RODRIGUEZ-RODRIGUEZ
ZENAIDA VEGA-SANTIAGO
and their conjugal partnership;
RADAMES SANTIAGO-LOPEZ and
ANGEL O. VELEZ-PACHECO

Plaintiffs

vs                                                    CIVIL 01-1267CCC

MIGUEL GABRIEL ORTIZ-VELEZ, in his
personal capacity and in his official capacity
as Mayor of the Municipality of Sabana
Grande; MUNICIPALITY OF SABANA
GRANDE, REPRESENTED BY ITS MAYOR;
LUIS BAEZ, SABANA GRANDE POLICE
COMMISSIONER
KATIA MEDINA-PEDRAZA
OSVALDO OCASIO-RODRIGUEZ, in their
personal capacity and in their official
capacity, and as employees, officers or
contractual representatives of the
Municipality of Sabana Grande represented
by its Mayor MIGUEL GABRIEL ORTIZ-
VELEZ
and persons X, Z and Z, one of them known
as Janet, others unknown all conspirators in
violation of plaintiffs Reynaldo Rodríguez-
Rodríguez, Radamés Santiago-López and
Angel L. Vélez-Pacheco's constitutionally
protected rights

Defendants

# O R D E R

This case is before us on defendant Katia Medina-Pedraza's (Medina) second Fed.R.Civ.P. 50 motion presented in open court at the conclusion of her evidence. On August 1, 2005, the Court entered an order on the verbal motion made by all defendants pursuant to Rule 50. The Court there set forth the reasons for dismissing the case entirely as to co-defendants Miguel Ortíz-Vélez and the Municipality of Sabana Grande and denied it as to municipal police officer Medina. A close reading of the qualified immunity cases, particularly that of Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001), and of the evidence, leads us to reexamine the qualified immunity denial regarding officer Medina. This determination takes into consideration plaintiffs' version of the facts as well as certain documentary evidence.

CIVIL 01-1267CCC                                    2

     Given that the qualified immunity analysis is fact-specific and that it must take into account the totality of circumstances, we must outline the scenario of the November 2, 2000 events.  On said date, municipal police officer Medina was on patrol, alone, during the 6:00 P.M.-2:00 A.M. shift.[1]   At that time, she had been eleven months on the force and had conducted approximately four arrests of intoxicated persons.  Around 8:30 P.M., during a preventive round, officer Medina approached the Popular Democratic Party (PDP) committee where PDP supporters were celebrating a bingo.  They had approximately 30 to 40 bingo tables in front of the committee in the middle of Julio Víctor Nuñez street.  Protective barriers had been placed at opposite ends of this street.  Once she passed the barriers, she went to the July 25th street where she observed approximately 20 to 25 persons who had gathered there.  There, she was informed that there had been a fight which had involved a young man with a mental defect named Julio Ortíz, who is Mayor Ortíz-Vélez' younger brother.  She radioed the officer on duty at the Sabana Grande station to report this disturbance.  Her undisputed testimony was that although she was not at the scene when another fight involving minor Henry Acevedo and plaintiff Reynaldo Rodríguez had occurred, she was told about it by Ortiz-Vélez just moments before the physical confrontation between both men.   Plaintiff Rodríguez testified that, as defendant's Exhibit C[2] reflects, he was found guilty, after trial, by Superior Court Judge Edgardo Delgado-García for an assault incident on November 2, 2000 against minor Henry Acevedo.  Rodríguez further stated that during his criminal trial on said charge, there was testimony that the Acevedo altercation happened before the incident with Ortíz-Vélez on the same date.  In any event, the evidence establishes that before Reynaldo Rodríguez was assaulted by anyone, officer Medina knew that there had been two physical confrontations that night, in one of which he had been involved.

---

[1]  The only evidence of what officer Medina did before approaching plaintiff Reynaldo Rodríguez-Rodríguez is officer Medina's own testimony.

[2]  Judgment of conviction in the case of People of Puerto Rico v. Reynaldo Rodríguez-Rodríguez for violation of Article 94 of Penal Code of Puerto Rico (simple battery).

CIVIL 01-1267CCC                    3

Officer Medina decided to remain on the July 25th street.  She moved to the corner in front of the Colmado Hermanos Súarez located between July 25th street and Francisco Mariano Quiñones street.  She parked behind the NPP truck which was playing loud campaign music.  There were several people who were PDP supporters on the street.  She approached Rodríguez to talk to him about his sound truck which was parked in an area close to a PDP activity.  While returning to her vehicle to once again report to the desk sergeant that she would be in the area to avoid confrontations, Ortíz-Vélez approached her to say that she should call the state police to take a complaint of an assault by Reynaldo Rodríguez against fifteen year old Henry Acevedo.  Plaintiff and Medina give differing versions of what occurred next in the confrontation between Rodríguez and Ortíz-Vélez.  For purposes of this analysis, we adopt plaintiff's version which describes Ortíz-Vélez as the one who threw the first blow against him without provocation.  Rodríguez stated that Ortíz-Vélez was accompanied by a group of approximately twenty-five persons and that he could see another crowd on the back.  While telling the police woman not to interfere, Ortíz-Vélez pulled an object like a blackjack from his pocket or waist, threw a blow at Rodríguez' head and hit him in the left hand and the eye.  He testified that officer Medina intervened as soon as Ortíz-Vélez hit him and he (Rodríguez) threw a punch back.  He described the sequence of events as follows:  I was hit, I threw a punch and hit, Medina hits me.  He described this as a continuous event that was simultaneous and happening in seconds.

Rodríguez described Medina's use of force as a blow to the ribs with the long side of her baton.  Nowhere in his testimony is there any reference to any physical action against him by Medina other than this one baton strike.  He explained that Medina took a step forward and with the point of her baton hit him on the ribs, that Ortíz-Vélez was between him and Medina, and that he took a step back about one foot placing the Mayor like to the side of him.  Rodríguez stated that Ortíz-Vélez did not fall when he hit him.  He also explained that simultaneously after Medina assaulted him the crowd jumped on him, beat him to the ground and kept hitting him.  According to his version, at that time the people had surrounded the Mayor, Medina and himself, and that after he felt the baton blow they jumped on him, having

CIVIL 01-1267CCC                              4

earlier said that the crowd hit him, took him by the hair and kept on hitting him while he was on the ground.  He later learned that there were 30 to 35 people there at the time.  He clarified that neither officer Medina nor Ortíz-Vélez pulled him down by the hair and that Ortíz-Vélez must have been down on the ground because the crowd jumped on him, on Ortíz-Vélez and on Medina.  He observed that Medina was not on the ground, that he did not know what Medina was doing after he fell to the ground, but that he did see the Mayor in a mess with the people on the ground and was unaware what the Mayor was doing after he (Rodríguez) fell to the ground.  In addition to Ortiz-Vélez and himself, there were two or three males on the ground who were assaulting him.  Rodríguez felt a hard blow to the left knee and recognized a young man named Osvaldo Ocasio-Rodríguez as the aggressor.  Rodríguez did not know how he got out of that situation.  After the assault he was assisted by Radamés Santiago and Angel Vélez-Pacheco at the place of the incident and was able to drive away in his own vehicle.

Plaintiff offered five photos which were admitted as Exhibit 1A through 1E taken the night of the events while at the hospital.  The ones relevant to officer Medina's use of force against him are plaintiff's Exhibit 1A and IC which show approximately five red spots on the side described by Rodríguez where he received the baton strike.  The hospital records of the emergency room of Hospital de la Concepción dated November 2, 2000, 9:30 P.M. reflect at page 168, translated, that he arrived by ambulance from the Sabana Grande Hospital.  Under the heading "Skin and Skeleton System Description," the injuries listed are abrasion right hand/forehand, left eye, abrasion right eye, abrasion forehead.  No fractures were reported.  The November 3, 2000 notes at page 171 of Exhibit 2 state that X-rays were discussed with the radiologist who found them negative for fractures or dislocation.  He was referred to an ophthalmologist for evaluation of the left eye trauma.

CIVIL 01-1267CCC                              5

Plaintiffs' Exhibits 3 and 4 are the medical records of defendant Ortíz-Vélez. The emergency room records dated November 2, 2000, plaintiffs' Exhibit 4,[3] describe Ortíz-Vélez' injury as three loose teeth and abundant bleeding. He was referred to the Metropolitan Hospital for X-rays. Plaintiffs' Exhibit 3 reflects the treatment by Dr. Giordano San Antonio, oral and maxillofacial surgeon, on November 3, 2000 in the morning hours. Dr. Giordano certifies that panoramic X-rays confirm clinical findings of displacement of teeth number 22, 23, 24, 25, 26 and 27. Upon being examined, Ortíz-Vélez presented clinical evidence of severe trauma in the anterior jaw region toward the lingual side.

Plaintiff witness Aníbal Almodóvar-Soto arrived on the scene at the time that Ortíz-Vélez was leaving with a group of people. He was an eyewitness, however, to what he described as a pretty bad beating of Rodríguez by a lot of people. He testified that he saw more than 50 persons acting violently around Rodríguez, that the street was full of people, and that he feared for Rodríguez' life. He narrated that some of the people would come and take turns to hit him, they would then get out of the way so others would hit him; that he did not try to stop them because it was a mob and too dangerous.

Radamés Santiago-López, soundman of the New Progressive Party (NPP) committee, was actively campaigning the night of November 2, 2000. He reached the intersection of July 25th street with Francisco Mariano Quiñones around 9:00 P.M. He stopped because he could not move further on since there was a PDP van that was obstructing the lane. He also saw the van driven by Rodríguez and the municipal police patrol in front of Rodríguez' van. He left his vehicle in the middle of the lane, walked to the corner of the Colmado Hermanos Suárez, and saw a person being beaten on that side of the sidewalk. He pushed his way through a large crowd and about four feet away from him he saw Rodríguez face up with Ortiz-Vélez on top assaulting him. He identified four other persons by name who were assaulting Rodríguez while he was on the ground. He mentioned that there were around 50 to 100 people there and

_____

[3]Only the first page of this exhibit was admitted since the English translation of the remaining three pages was never submitted by plaintiffs, despite extensions granted.

CIVIL 01-1267CCC                              6

some 20 to 25 were taking turns hitting him.  The only action regarding officer Medina that he mentioned was that, while he and Angel Vélez-Pacheco assisted Rodríguez and put him in the van, Medina approached them to tell them that Rodríguez could not leave.  Rodríguez did leave in his vehicle while Santiago-López was talking to officer Medina.

     Although Rodríguez and witness Santiago-López testified that Ortíz-Vélez assaulted Rodríguez, officer Medina described Ortíz-Vélez' intervention as seeking only that she call the state police to investigate an assault by Rodríguez on a minor.  Rodríguez and Medina concur, however, that she used the baton after Rodríguez threw a punch and hit Ortíz-Vélez.  She said that Rodríguez hit Ortíz-Vélez in the mouth with one of his hands, and  that after this, she pulled out her nightstick, and went toward Rodríguez to try to arrest him.  She stated that she pushed Rodríguez with the nightstick and that the baton was horizontal to her body when she did this.  She was not able to arrest him because the people jumped on him at that point, she was pushed aside and the people started to assault him.  She testified that approximately 10 or 15 persons assaulted Rodríguez on different parts of his body and that at that moment he was 5 or 7 feet from her because of the crowd.  She tried to push away the 10 to 15 people who were hitting him, yet the closest she could get to him was 2 or 3 feet.  She testified that she twice sent an emergency call over the radio, and that, because she was the only officer there, she was not able to push all the people off Rodríguez.   The crowd dispersed when the ambulance sirens were heard.  She stated that she did not investigate the case, that the state police did.

     Officer Medina's Rule 50 motion is based on qualified immunity.  Movant argues that she had information that night that Rodríguez had struck a minor before the confrontation with Ortíz-Vélez and that she is protected by qualified immunity if when she hit Rodríguez she mistakenly but reasonably believed that he would hit again.  She further argues that there is no evidence in this case that she made improper or unreasonable use of the baton under the circumstances that she confronted when she attempted to arrest Rodríguez nor is there evidence that she violated any police regulation on the use of the baton.  Plaintiffs' response describes her

use of the baton as unprovoked.  They argue that her actions were a deliberate provocation to a hundred employees to lynch Rodríguez.  They claim that the only explanation for Medina's inability to recognize the municipal employees who were at the scene of the beating is that she is loyal to the Municipality and to Mayor Ortíz-Vélez.  As part of the unreasonableness of her conduct, Rodríguez contends that Medina knew that his life was in danger and that she did not even use her weapon as a sound equipment to shoot in the air.   He claims that Medina's blow was so strong that it threw him to the ground, and that it was foreseeable that the mob would hit him.  Finally, in a misstatement of the evidence, Rodríguez contends that Medina should have told Ortíz-Vélez that the earlier fight did not involve Rodríguez.  As to the latter, the Court notes that defendant's Exhibit C and Rodríguez' own testimony establish that Rodríguez was indeed involved in a physical confrontation with a minor that same night of November 2, 2000 and that he was found guilty of simple battery.  This incident, for which he was found guilty, is separate and unrelated to the other fight between Ortíz-Vélez' brother and another person.

        Against this factual background, we now consider the guiding principles of the qualified immunity inquiry.  In Saucier v. Katz, 121 S.Ct. 2151, 2154,  the Court held that "the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest."  Saucier, at 121 S.Ct. 2158, made clear that "[t]he inquiries for qualified immunity and excessive force remain distinct, even after Graham [v. Connor, 490 U.S. 386 (1989)]," where the Court held that "claims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's 'objective reasonableness standard,' not under substantive due process principles."  Graham, 490 U.S. 388, 394.  In making the distinction, the Court in Saucier makes reference to the factors relevant to the merits of the constitutional excessive force claim, for example, severity of the offense, threat posed by suspect, or risk of flight.  Placing qualified immunity in its proper context, the Court cites Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), which characterizes the concept as "an entitlement not to stand trial or face the other

burdens of litigation" and "an <u>immunity from suit</u> rather than a mere defense to liability."
(Emphasis in original).  The Court states that the "superficial similarity" between the Fourth
Amendment's guarantee to be free from unreasonable searches and seizures and the dispositive
inquiry in the qualified immunity analysis on whether it would be clear to a reasonable officer
that his conduct was unlawful in the situation he confronted cannot, however, overcome either
the Court's "history of applying qualified immunity analysis to Fourth Amendment claims
against officers or the justifications for applying the doctrine in an area where officers perform
their duties with considerable uncertainty as to 'whether particular searches or seizures comport
with the Fourth Amendment.'" <u>Saucier</u>, 121 S.Ct. at 2157 (quoting <u>Anderson v. Creighton</u>,
483 U.S. 635, 644 (1987).  Quoting <u>Anderson</u>, the Court refers to the officer who is
entitled to immunity because he "reasonably acted unreasonably."  <u>Id.</u>, (quoting <u>Anderson</u>,
483 U.S. at 643).

      Having held that the qualified immunity analysis is distinct and separate from the
excessive force analysis, and that said separate inquiry is neither superfluous nor inappropriate,
the Court observed that unlike the excessive force claim the immunity inquiry has a further
dimension.  It expressed that "[t]he concern of the immunity inquiry is to acknowledge that
reasonable mistakes can be made as to the legal constraints on particular police conduct" and
that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here
excessive force, will apply to the factual situation the officer confronts."  <u>Saucier</u>, 121 S.Ct. at
2158.  It concluded, therefore, that "[i]f the officer's mistake as to what the law requires is
reasonable, however, the officer is entitled to the immunity defense."  <u>Id.</u>

      <u>Saucier</u> outlines the two steps of the qualified immunity analysis: (1) if a constitutional
right was violated and (2) whether the right was clearly established.  It advises lower courts that
in this second dispositive inquiry, it is not enough to conclude that there has been a violation
of the general proposition established by <u>Graham</u> that use of force violates the Fourth
Amendment if it is excessive under objective standards of reasonableness.  Quoting <u>Anderson</u>,
it refers to the specificity requirement of the inquiry stating, "that the right the official is alleged

CIVIL 01-1267CCC                              9

to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. Emphasizing the need of courts to conduct the second prong inquiry with greater degrees of specificity, it instructs that if a constitutional violation is found based on the general rule prohibiting excessive force, then one must "proceed to the question whether this general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances the officer faced." Saucier, 121 S.Ct. at 2159.  In Cox v. Hainey, 391 F.2d 25, 30 (1st Cir. 2004), the First Circuit identifies this specificity inquiry as a third prong of the qualified immunity analysis stating:

> Even though the right to be free from an arrest without probable cause is firmly established, a further hurdle remains . . . The court below was required to determine whether the defendant had confronted particular circumstances in which the application of general principles did not yield a certain answer and, if that were the case, to determine whether the defendant had responded reasonably to that idiosyncratic fact pattern . . . In short, to set aside the buckler of qualified immunity 'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense.'"

Elaborating on this, our Circuit observed that "the third prong of the qualified immunity inquiry . . . channels the analysis from abstract principles to the specific facts of a given case." Id., at 31.

In Saucier, quoting Graham for the proposition that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," Graham 490 U.S. at 396, the Court found that in the circumstances faced by officer Saucier there were grounds for him to conclude that he had legitimate justification under the law for acting as he did.  The Court concluded that there was no clearly established rule nor had any case been cited to it prohibiting the officer to act in the manner in which he did and that this conclusion was confirmed by the fact that the person detained did not suffer injury as a result of the force used.

CIVIL 01-1267CCC                                10

The Court of Appeals for the First Circuit has expressed itself in several cases on the fair warning aspect of the "clearly-established" inquiry. In <u>Suboh v. District Attorney's Office of Suffolk</u>, 298 F.3d 81, 93 (1st Cir. 2002), the Court discussed these principles stating:

> One tried and true way of determining whether this right was clearly established at the time the defendants acted, is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights. This inquiry encompasses not only Supreme Court precedent, but all available case law.

(Citations omitted). In <u>Hope v, Pelzer</u>, 122 S.Ct. 2508, 2515-16 (2002), the Supreme Court further developed the fair notice requirement, citing <u>Saucier</u> for the proposition that qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." It rejected the requirement, however, that previous cases be materially similar. In 1997, in <u>United States v. Lanier</u>, 117 S.Ct. 1219 (1997), the Court had already rejected a requirement that previous cases be "fundamentally similar" for there to be fair warning. The notice question was defined in <u>Hope</u> as follows: whether the state of the law and the cases relied on gave the officer reasonable or fair warning that his actions were unconstitutional. The conduct complained of in <u>Hope</u> was the hitching of an inmate to a post for an extended period of time in a painful position under degrading and dangerous circumstances as punishment for prior conduct. The Court acknowledged that "[t[he obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. " <u>Hope</u>, 122 S.Ct. at 2518. Additionally, there was a DOJ report condemning the practice after a study of Alabama's use of the hitching post and two Eleventh Circuit precedents: <u>Gates v. Collier</u>, 501 F.2d 1291, 1306 (5th Cir. 1974), which held that it was unconstitutional to handcuff inmates to the fence and to cells for long periods of time, and, <u>Ort v. White</u>, 813 F.2d 318 (11th Cir. 1987), which suggested that refusing water to an inmate as a coercive measure would be unconstitutional.

CIVIL 01-1267CCC                              11

Evaluating the facts in the light most favorable to plaintiff, the Court finds that in light of the general prohibition against the use of excessive force, plaintiff has shown a violation of his Fourth Amendment rights.  The inquiry does not end here.  The "clearly established" requisite - the second prong of the qualified immunity analysis - requires a level of specificity and a more particularized inquiry which must delve into the factual circumstances that officer Medina confronted on the night of November 2, 2000 regarding a physical confrontation between plaintiff and defendant Ortiz-Vélez, five days before the general election of November 7, 2000.

We start by outlining what officer Medina knew just moments before the actual incident involving Rodríguez, Ortiz-Vélez and herself.  She had observed some 20 to 25 persons already gathered in the July 25th street where violence broke out some thirty minutes later.  She had been informed by onlookers of an altercation that had already occurred between Julio Ortíz, the Mayor's younger brother and another person.  She reported this to the desk sergeant on duty that night.  While at the site, she observed the NPP sound truck with the campaign music blaring in close proximity to a PDP committee where a bingo activity was being held by PDP supporters.  She again reported to the desk sergeant her intention to remain in the area to avoid confrontations.  While inquiring from Rodríguez what was going on, defendant Ortíz-Vélez approached and requested that she call the state police so that it would investigate allegations that plaintiff had assaulted a fifteen year old minor.  At this point she had been told of two altercations.

Thereafter, events unfolded rapidly.  While surrounded by a large crowd, a physical confrontation ensued immediately before officer Medina attempted to arrest Rodríguez. According to plaintiff's version, Ortíz-Vélez hit Rodríguez with a metal object like a blackjack on the eye, immediately thereafter Rodríguez responded throwing a punch that hit Ortíz-Vélez in the face, followed simultaneously thereafter by a baton strike to his ribs by Medina.  The crowd jumped on all three of them:  Rodríguez, Ortíz-Vélez and Medina.  The first two fell to

CIVIL 01-1267CCC                    12

the ground.  Medina was unable to arrest Rodríguez.  Plaintiff has submitted no evidence from which it can be inferred that Medina incited the crowd to attack him or that her one baton strike felled him.  Nor is there any evidence that, had it not been for Medina's use of the baton, Rodríguez would not have been beaten by the crowd.  Plaintiff's eyewitnesses to the events that night described the crowd as an irrational mob that viciously hit Rodríguez all over his body with flagposts and feet.  They estimated that at least 20 to 25 persons took turns during an assault that lasted approximately ten minutes.  Plaintiff testified that the exchange of blows between Ortíz-Vélez and himself and Medina's use of the baton all occurred in a matter of seconds.

Medina was the only police officer on the scene. The evidence shows that the single baton strike was incident to an attempted arrest of Rodríguez.  Her undisputed testimony is that she twice sent an emergency radio call for assistance because she could not control the crowd by herself.  She was aware that in addition to the 20-25 persons who actually attacked plaintiff and who were immediately surrounding her, Rodríguez and Ortíz-Vélez, there was a larger crowd of onlookers on the street.  These persons were potential aggressors.

Viewing the officer's conduct in the context of the particular circumstances that she confronted that night, the Court answers in the negative the dispositive question whether it would be clear to a reasonable officer in her position that her conduct was unlawful.  In an effort to reestablish order, by herself, in the midst of a situation which rapidly escalated to a violent melee, the single baton strike against Rodriguez incident to his attempted arrest was a reasonable use of force.  Plaintiffs' arguments disregard the reality of the situation that officer Medina confronted.  Plaintiffs' arguments also ignore the clear mandate of Saucier, that the dispositive inquiry in the final step of the immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id., 121 S.Ct. at 2156.  That fact specific analysis mandates that we reject plaintiffs' arguments, bereft of any evidentiary

CIVIL 01-1267CCC                        13

support, that officer Medina sided with Ortíz-Vélez or that they conspired against plaintiff Rodríguez, that she provoked the crowd to lynch him, that it was her single baton strike which threw him down, or that this blow caused him serious injury.[4]

Finally, there is no evidence of the existence of any law enforcement rule or regulation on the use of a baton that would make her conduct unlawful.  Nor has any case been identified which even suggests that, given the specific circumstances that officer Medina confronted, it had been clearly established and she had been given fair warning that her actions violated Rodríguez' constitutional rights.  See Hope, 122 S.Ct. at 2522; Suboh, 298 F.3d at 93.

For the reasons stated, the second Fed.R.Civ.P. 50 motion, based on qualified immunity, presented by defendant Medina is GRANTED.  Accordingly, judgment shall be entered DISMISSING the sole remaining claim against defendant Katia Medina-Pedraza based on the alleged unconstitutional use of excessive force in violation of the Fourth Amendment.

SO ORDERED.

At San Juan, Puerto Rico, on August 15, 2005.


S/CARMEN CONSUELO CEREZO
United States District Judge

---

[4] Plaintiff's testimony, his hospital records and the photos he submitted in evidence of the area of his body where he received the baton strike all show that the injury resulting from the baton was not a serious lesion.